UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DENNIS RAMOS, ED RODRIGUEZ, EDWARD
KRALICK, and DANIEL EMERSON, individually
and on behalf of all other persons similarly situated
who were employed by TELGIAN CORPORATION
and any other entities affiliated with, controlling,
or controlled by TELGIAN CORPORATION,

                Plaintiffs,

          -against-

TELGIAN CORPORATION and any other entities
affiliated with, controlling, or controlled by
TELGIAN CORPORATION,

                Defendant.
-----------------------------------------------------------------x

**MEMORANDUM & ORDER**

14–CV–3422 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiffs Dennis Ramos, Ed Rodriguez, Edward Kralick, and Daniel Emerson[1]

(collectively, "Plaintiffs") brought this action to recover, on behalf of themselves individually and

all similarly situated individuals, unpaid overtime compensation from Defendant Telgian

Corporation ("Defendant" or "Telgian"), under Sections 207 and 216 of the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. §§ 207, 216(b), and, individually, unpaid overtime and spread-of-hours

compensation under the New York Labor Law ("NYLL"), NYLL § 663, and the New York Codes,

Rules, and Regulations ("NYCRR"), 12 NYCRR §§ 142-2.2, 142-2.4.[2]

---

[1] In the parties' Rule 26(f) Joint Proposed Discovery Plan ("Rule 26(f) Plan"), filed July 29, 2014, Plaintiffs sought to amend their complaint to add Daniel Emerson as a Named Plaintiff, and Defendant did not object. (*See* Dkt. 13.) The Honorable Lois Bloom approved the parties' Rule 26(f) Plan in an order dated August 21, 2014. The Court accordingly has amended the caption to reflect the addition of Emerson as a Named Plaintiff, and has treated him as such herein.

[2] The NYCRR consists of, in relevant part, regulations implementing the NYLL. *See, e.g., Khereed v. West 12th St. Rest. Grp. LLC*, No. 15-CV-1363, 2016 U.S. Dist. LEXIS 16893, at *6 (S.D.N.Y. Feb. 11, 2016) (NYCRR "implementing regulation" of NYLL); *Siewharack v. Queens Long Island Med. Grp., P.C.*, No. 11-CV-3603, 2012 U.S. Dist. LEXIS 170556, at *2 (E.D.N.Y. Nov. 30, 2012) (NYCRR "regulations promulgated []under" NYLL).

The parties have cross-moved for summary judgment. Defendants seek dismissal of all of Plaintiffs' claims, arguing that Plaintiffs were properly compensated for all overtime hours pursuant to the fluctuating workweek ("FWW") method, and that Plaintiffs earned more than the minimum wage, such that they are not entitled to spread-of-hours compensation. Plaintiffs seek a finding that Defendant failed to comply with the FLSA, NYLL, and NYCRR by only compensating Plaintiffs for overtime hours at a rate of one-half their regular hourly rate. Plaintiffs also argue that summary judgment should be granted in their favor with respect to Defendant's liability for Plaintiffs' spread-of-hours claim. For the reasons set forth below, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Plaintiffs' cross-motion for summary judgment is DENIED.

---

In their Complaint, Plaintiffs asserted their individual State law claims for overtime under 12 NYCRR § 146-1.4 and for spread-of-hours compensation under § 146-1.6. (Dkt. 1 ¶¶ 2, 46, 52, 54, 56, 59.) But as Defendant notes, correctly, these provisions are contained within the Hospitality Industry Wage Order, and Defendant is not in the hospitality industry. (*See* Def. Mot. at 20 n.19.) Rather, Plaintiffs' overtime and spread-of-hours State law claims would arise, if at all, under 12 NYCRR §§ 142-2.2 and 142-2.4, which apply to miscellaneous industries and occupations, for overtime and spread-of-hours compensation, respectively. Plaintiffs, in effect, concede this by arguing on summary judgment that their claims to overtime and spread-of-hours compensation arise under these provisions. (*See* Pl. Mot. at 14 (overtime under 12 NYCRR § 142-2.2), 25 (spread-of-hours under 12 NYCRR § 142-2.4); Pl. Opp. at 24–25 (spread-of-hours under 12 NYCRR § 142-2.4).)

All references to "Def. Mot." refer to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment. (Dkt. 31.) Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Dkt. 38) is referred to herein as "Pl. Opp." and Defendant's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment (Dkt. 42) is referred to herein as "Def. Reply." All references to "Pl. Mot." refer to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment. (Dkt. 36.) Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. 40) is referred to herein as "Def. Opp." and Plaintiffs' Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment (Dkt. 44) is referred to herein as "Pl. Reply."

*FACTUAL BACKGROUND*

I.    Plaintiffs' Employment with Telgian

Defendant Telgian provides, *inter alia*, fire alarm and sprinkler inspection services.[3]  (Def. 56.1 ¶ 1.)  Defendant employed Plaintiffs as fire protection inspectors for the following time periods:  Ramos from August 26, 2013 until his resignation on May 2, 2014 (Pl. 56.1 ¶ 1; Def. 56.1 ¶ 2); Rodriguez from May 10, 2010 until his resignation on February 7, 2014 (Pl. 56.1 ¶ 2; Def. 56.1 ¶ 3); Kralick from August 26, 2002 until his termination on December 16, 2011 (Pl. 56.1 ¶ 3; Def. 56.1 ¶ 4); and Emerson from approximately March 2007 until his resignation on

---

[3] Because the parties have cross-moved for summary judgment, there are five factual statements before the Court:  Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1") in support of its summary judgment motion (Dkt. 30); Plaintiffs' Response to Defendant Local Civil Rule 56.1(a) Statement ("Pl. Resp. to Def. 56.1") in opposition to Defendant's motion for summary judgment (Dkt. 38-1); Plaintiffs' Statement of Material Facts Pursuant to Rule 56.1 ("Pl. 56.1") in support of Plaintiffs' motion for summary judgment (Dkt. 35); Defendant's Response and Counter-Statement to the Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def. Resp. to Pl. 56.1") in opposition to Plaintiffs' motion for summary judgment (Dkt. 40-2); and Plaintiffs' Response to Telgian's Local Civil Rule 56.1(a) Additional Statement of Undisputed Material Facts ("Pl. Reply 56.1") in further support of their motion for summary judgment (Dkt. 44-1).  At the Court's request, the parties also submitted a Joint Supplemental Statement of Material Facts Pursuant to Rule 56.1 ("Joint Supp. 56.1"), setting forth hours and earnings information for the weeks in which Plaintiffs worked the greatest number of hours.  (*See* Dkt. 49.)

The facts in this section are taken from these various Rule 56.1 submissions and the record evidence cited therein.  Unless otherwise noted, a standalone citation to a Rule 56.1 Statement denotes that the Court has deemed the underlying factual allegation undisputed.  Any citations to a party's Rule 56.1 Statement incorporates by reference the documents cited therein.  Where relevant, however, the Court has cited directly to underlying documents that have been attached as exhibits to five declarations submitted in support of, or in opposition to, the cross-motions before the Court:  Declaration of Aaron Warshaw in Support of Defendant's Motion for Summary Judgment ("Warshaw Decl.") (Dkt. 32); Declaration of Lloyd Ambinder in Opposition to Telgian's Motion for Summary Judgment ("Ambinder Opp. Decl.") (Dkt. 39); Reply Declaration of Aaron Warshaw in Further Support of Defendant's Motion for Summary Judgment ("Warshaw Reply Decl.") (Dkt. 43); Declaration of Lloyd Ambinder in Support of Plaintiffs' Motion for Partial Summary Judgment ("Ambinder Decl.") (Dkts. 37 & 45); and Declaration of Aaron Warshaw in Opposition to the Plaintiffs' Summary Judgment Motion ("Warshaw Opp. Decl.") (Dkt. 41).

approximately July 4, 2014 (Pl. 56.1 ¶ 4; Def. 56.1 ¶ 5).

II.     Plaintiffs' Compensation Agreements

At or about the time each Plaintiff was interviewed and hired, they received an offer letter and Overtime Compensation Consent Agreement ("Compensation Agreement"), which acknowledged the terms and conditions of their compensation. (Def. 56.1 ¶ 8.) Each Plaintiff was required to sign the Compensation Agreement. (*Id*. ¶ 9.) Amanda Flori, Defendant's Human Resources Supervisor, testified that, as a general matter, employees "have a reasonable amount of time to review the [hiring] documents before executing and returning" them to Defendant. (Flori Tr.[4] at 105:17–106:20.)

In each of the Plaintiffs' Compensation Agreements, the formula for calculating their regular rates of pay was described as "Weekly salary / 40 workweek hours." (Pl. 56.1 ¶ 11; Ambinder Decl. Ex. G at ECF 51, 53, 56, 58.)[5] The Compensation Agreements further stated that the formula for calculating Plaintiffs' "Half-Time Rate" was "Regular Rate x ½." (Pl. 56.1 ¶ 12.) Finally, the Compensation Agreements stated that the formula for calculating Plaintiffs' "OT

---

[4] All references to "Flori Tr." refer to the Deposition of Amanda Flori in this action, excerpts of which are attached to Defendant's submissions and a full copy of which is attached as Exhibit O to the Ambinder Declaration (Dkt. 37-3 at ECF 69–159). All page references to "ECF" pagination correspond to page numbers generated by the Electronic Court Filing ("ECF") system, rather than to the document's internal pagination.

[5] Kralick signed two agreements pertaining to his compensation. The first, signed August 26, 2002, was titled "Compensation Consent Agreement / Fluctuating Work Week." (Ambinder Decl. Ex. G at ECF 55.) The second, signed February 24, 2005, was titled "FMG Overtime Compensation Consent Agreement." (*Id*. at ECF 56.) All references herein to "Compensation Agreement" with respect to Kralick refer to his 2005 agreement.

Kralick's 2002 agreement defined "Regular Rate" as "Weekly salary / Number of Hours Worked," and the regular rate varied from week to week in the "Sample Overtime Calculation" provided therein. (*Id*. at ECF 55.) But Kralick's Compensation Agreement defined "Regular Rate" as "Weekly salary / 40 workweek hours," and the rate remained constant from week to week in the sample calculation, just as in the other Plaintiffs' Compensation Agreements. (*See id*. at ECF 56.)

[overtime] Pay" was "Half-Time Rate x Number of Hours Worked over 40." (*Id.* ¶ 13.) The Agreements also provided that "[o]vertime [would] be acceptable with prior approval, and on an as-needed basis" (Ambinder Decl. Ex. G), though Defendant's Human Resources Supervisor testified that "with the amount of work [Defendant] ha[s], it's just kind of a blanket approval for now that overtime is allowed." (Flori Tr. at 178:22–179:10.)

With respect to overtime compensation, Plaintiffs' Compensation Agreements stipulated that the overtime calculation would be computed "pursuant to 29 U.S.C. Sec. 207(g)(3) and 29 C.F.R.778.114[,] wherein when an employee who works more than 40 hours in a workweek and is not docked for time not worked,[6] the employer is then [permitted] to compensate the employee at a half-time rate." (Ambinder Decl. Ex. G at ECF 51, 53, 56, 58.) The Compensation Agreements further provided "Sample Overtime Calculation[s]," stating the "# of Hours," "Salary,"[7] "Regular Rate," "Half-time Rate," "OT Pay," and "Total Pay" under four scenarios: where the employee worked 30, 40, 50, and 60 hours. In each example, the "Salary" remained the same, and the "Regular Rate" and "Half-time Rate" similarly remained constant. (Ambinder Decl. Ex. G at ECF 51, 53, 56, 58.)[8] The "OT Pay" differed only based on the number of hours worked

---

[6] The Compensation Agreements do not define this phrase, but the Court presumes that, consistent with the FWW scheme, an employee is "not docked for time not worked" when they receive a fixed salary regardless of the number of hours worked in a week, even fewer than 40.

[7] The "Salary" listed in the Sample Overtime Calculations in each Plaintiff's Compensation Agreement was either a weekly or a bi-weekly salary, though it did not always correspond to the Plaintiff's actual salary stipulated in the Agreement. (*Compare* Ambinder Decl. Ex. G at ECF 51 (Ramos's Compensation Agreement provided for a bi-weekly salary of $1,760.00 but sample calculation used a bi-weekly salary of $1,920), *with id.* at ECF 53 (Rodriguez's Compensation Agreement provided for bi-weekly salary of $1,615.38 and sample calculation used a weekly salary of one half of that, $807.69).)

[8] In the Sample Overtime Calculations in Kralick's Compensation Agreement, the Half-time Rate is listed as $9.14 for the sample 50-hour week but $69.14 for the 60-hour sample week.

over 40.  (Ambinder Decl. Ex. G at ECF 51, 53, 56, 58.)

Plaintiffs' Compensation Agreements also explained the method by which Plaintiffs' overtime would be calculated as follows:  "For each workweek that I work in excess of 40 hours, my overtime rate will be my normal hourly rate multiplied by .5," *i.e.*, "if [a Plaintiff's] normal hourly rate is $10 per hour, and [he] work[s] 50 hours, [he] would be paid 40 x $10 plus 10 x $5 for a total of $450."  (Pl. 56.1 ¶ 15.)  The Compensation Agreements, however, did not explain whether there was a fixed weekly salary in this hypothetical, or whether the $450 was in addition to any such fixed weekly salary or represented the total compensation for that week.  (Ambinder Decl. Ex. G at ECF 51, 53, 56, 58.)  Each Plaintiff's regular rate was calculated by annualizing their bi-weekly salary and dividing by 2,080 hours, or 40 hours per week times 52 weeks of the year, and each Plaintiff's overtime rate was calculated by multiplying that rate by 0.5.  (Def. 56.1 ¶ 37.)  Plaintiffs' regular rate did not vary from week to week and was never calculated by dividing Plaintiffs' salaries by the total number of hours they worked in a given week.  (Pl. 56.1 ¶¶ 8, 18.)

Defendant's Human Resources Supervisor testified that employees compensated under the FWW method would be paid the same weekly salary regardless of whether they worked less than 40 hours that week.  (Flori Tr. at 177:21–178:3, 180:22–181:9.)  The salaries listed in Plaintiffs' payroll records,[9] however, occasionally deviate from Plaintiffs' fixed weekly salaries, with no

---

The Court presumes this is a typo, as the OT Pay calculations for both weeks use the Half-Time rate of $9.14.  (*See* Ambinder Decl. Ex. G at ECF 56.)

[9] These payroll records include both earnings statements and what appear to be overtime paystubs.  (*Compare* Ambinder Opp. Ex. A (earnings statements), with *id*. Ex. B at ECF 23–26 (overtime paystubs); Ex. C (same).)  The earnings statements list "Regular" and "Halftime OT" rates, as well as what appears to be the salary for the applicable period, listed under "Current Period."  (*Compare id*. Ex. A at ECF 2 (Ramos's earnings statement listing "880.00" under "Current Period"), *with* Def. 56.1 ¶ 32 (Ramos's bi-weekly salary was $1,760.00); Def. Resp. to Pl. 56.1 ¶ 19 (Ramos's fixed weekly salary was $880).  *See also* Flori Tr. at 120:3–7 (number listed under "Current Period" on earnings statements is "the bi-weekly salary").)

apparent explanation on the face of the records.  (*Compare, e.g.*, Ambinder Opp. Decl. Ex. A at ECF 9 (Ramos's earnings statement from pay date December 13, 2013 listed salary under "Current Period" as "1679.70"), *with* Def. 56.1 ¶ 32 (Ramos's bi-weekly salary was $1,760.00); *compare* Ambinder Opp. Decl. Ex. B at ECF 46 (Rodriguez's earnings statement from pay date December 13, 2013 listed salary under "Current Period" as "1728.00"), *with* Def. 56.1 ¶ 33 (Rodriguez's bi-weekly salary at end of employment in February 2014 was $1,922.40).)

It is undisputed that Plaintiffs' salaries compensated them in excess of the minimum wage, generally substantially so, even for the weeks in which they worked the greatest number of hours during their tenures at Telgian.  (*See* Joint Supp. 56.1 at 1–4 (Ramos worked 91.21 hours, earned $9.65 per hour under salary provided in Compensation Agreement; Rodriguez worked 76.24 hours, earned $12.61 per hour under salary provided in Compensation Agreement; Kralick worked 66.1 hours, earned $13.06 per hour under salary provided in Compensation Agreement; Emerson worked 69.24 hours, earned $13.89 per hour under salary provided in Compensation Agreement).)  It is similarly undisputed that none of the Plaintiffs received an additional hour's pay at minimum wage when they worked more than 10 hours in a day.  (Pl. 56.1 ¶¶ 34 (Ramos), 50 (Rodriguez), 68 (Kralick), 83 (Emerson).)

A.    Ramos

Ramos's Compensation Agreement stipulated that his position was "salaried, non-exempt," meaning he was "paid both for the job function and for hours that [he] work[ed] in excess of 40 per week . . . ."  (Ambinder Decl. Ex. G at ECF 51; *see also* Warshaw Decl. Ex. Q at ECF 9

---

The overtime paystubs list an "Hourly Rate," an "OT Rate," and an "Annual Salary."  The "Annual Salary" appears to be the salary applicable to the paystub period, *i.e.*, the salary for a two-week pay period.  (*Compare* Ambinder Opp. Decl. Ex. B at ECF 23 (listing "Annual Salary" as "1615.38"), *with* Def. 56.1 ¶ 33 (Rodriguez's starting salary was $1,615.38 bi-weekly).)

(Ramos "Offer of Employment" letter, signed August 19, 2013, stated: "This is a salaried, non-exempt position, which means you are paid both for the job function and for overtime hours at a half-time rate.").) It provided for a salary of "$1,760 bi-weekly, which if annualized is the equivalent of $45,760.00." (Ambinder Decl. Ex. G at ECF 51; *see also* Def. 56.1 ¶ 32.) The Compensation Agreement explained that this bi-weekly salary "represent[ed] straight time compensation for all hours worked and [would] not fluctuate whether [Ramos] work[ed] more or less than 40 hours in a week period." (Ambinder Decl. Ex. G at ECF 51.)

Ramos's Compensation Agreement explained that "[t]he hourly rate for overtime purposes [wa]s calculated by dividing $45,760.00 [salary] by 2080 hours (40 hours x 52 workweeks in a year). Therefore, [his] overtime compensation rate [would] be based off [of] an hourly rate of $22.00." (Ambinder Decl. Ex. G at ECF 51.) Plaintiffs contend that Ramos was paid $22.00 per hour—his weekly salary of $880 divided by 40 workweek hours—for the first 40 hours he worked during each week, and was paid only half of that—$11.00 per hour—for every hour he worked over 40 hours in a week. (Pl. 56.1 ¶¶ 19–23.) Defendant disputes this contention, claiming that Ramos was paid a fixed weekly salary of $880 for all hours worked each week, and that Ramos's regular rate of $22.00 per hour—his fixed weekly salary of $880 divided by 40—was calculated solely for the purposes of determining and showing Ramos's 50% overtime premium, which was $11.00 per hour for hours worked over 40 in a week. (Def. Resp. to Pl. 56.1 ¶¶ 19–23.)[10]

---

[10] Record evidence provides conflicting descriptions of Defendant's method for calculating each Plaintiff's compensation. For example, an email dated August 20, 2013 between Defendant's employees regarding Ramos's hiring lists his "salary" as "$22.00/hr." (Ambinder Decl. Ex. N.) Rodriguez's workers' compensation form, dated June 23, 2011, describes his wages as $1,922.67 bi-weekly based on eight hours of work per day, with an overtime rate of $12.02 and 15 hours of overtime each week considered the norm (Ambinder Decl. Ex. M at ECF 60–61), while Kralick's form, dated September 27, 2011, lists his wages as $21.59 hourly based on eight hours of work per day and does not list an overtime rate (*id*. at ECF 64).

Ramos testified that his hours varied from 50 to 65 hours per week and varied each day depending on his workload. (Ramos Tr.[11] at 27:9–13, 86:6–13; *see also* Ambinder Decl. ¶ 54 (Ramos's "Average hours worked per week" was "61.7").) The most hours Ramos worked in a one-week period during his tenure at Telgian was the week of September 15 through 21, 2013, during which Ramos worked 91.21 hours. (Joint Supp. 56.1 ¶ 1.)

B.    Rodriguez

Rodriguez's Compensation Agreement also stated that his position was "salaried, non-exempt," meaning he would be "paid both for the job function and for hours that [he] work[ed] in excess of 40 per week . . . ." (Ambinder Decl. Ex. G at ECF 53; *see also* Warshaw Decl. Ex. J at ECF 2 (Rodriguez "Offer of Employment" letter, signed April 30, 2010, stated: "This is a salaried, non-exempt position, which means [he is] paid both for the job function and for overtime hours at a half-time rate.").) The agreement provided for a salary of "1,615.38 bi-weekly, which if annualized is the equivalent of $42,000." (Ambinder Decl. Ex. G at ECF 53; *see also* Def. 56.1 ¶ 33 (Rodriguez's starting salary was $1,615.38 bi-weekly, but by the time he ended his employment, he was being paid $1,922.40 bi-weekly)[12].) The Compensation Agreement explained that the "bi-weekly salary represent[ed] straight time compensation for all hours worked and [would] not fluctuate whether [Rodriguez] work[ed] more or less than 40 hours in a week period." (Ambinder Decl. Ex. G at ECF 53.)

Rodriguez's Compensation Agreement explained that his "hourly rate for overtime

---

[11] All references to "Ramos Tr." refer to the Deposition of Dennis Ramos in this action, excerpts of which both parties have submitted in connection with the cross-motions for summary judgment.

[12] Plaintiffs allege that when Rodriguez departed Telgian, his salary was $961.33 per week. (Pl. 56.1 ¶ 39.) Defendant does not dispute this, though it asserts that Rodriguez's final salary was approximately $961.20 per week. (*See* Def. Resp. to Pl. 56.1 at 10 n.3.)

purposes was calculated by dividing $42,000 [annualized salary] by 2080 hours (40 hours x 52 workweeks in a year)," such that his "overtime compensation rate [would] be based off an hourly rate of $20.19 ($42,000/2080)." (*Id*.) Plaintiffs contend that this hourly rate—$20.19 when he started and $24.03 immediately before his departure from Telgian—was his rate of pay only for the first 40 hours in a week, and that he was paid only half that rate—between $10.10 and $12.02— for hours worked over 40 in any given week. (Pl. 56.1 ¶¶ 38–40.) Defendant disputes this claim, contending that Rodriguez's fixed weekly salary—$807.69 when he started and $961.33 just before he departed—was compensation for all hours worked, and that Rodriguez's regular rate of between $20.20 and $24.03 per hour—*i.e.*, his fixed weekly salary of $807.69 and $961.33, respectively, divided by 40—was calculated solely for purposes of determining and showing Rodriguez's 50% overtime premium, which ranged from $10.10 to $12.02 per hour for hours worked over 40 in a week. (Def. Resp. to Pl. 56.1 ¶¶ 38–40.)

Rodriguez testified that his hours varied across weeks and were not "cookie cutter," and that they depended on the state he was working in and how far he was driving. Generally, his hours varied from 50 to 55 hours per week, though he occasionally worked more than 55 hours in a week. (Rodriguez Tr.[13] at 43:20–44:23, 128:11–20; Ambinder Decl. ¶ 55 (Rodriguez's "Average hours worked per week" was "51").) The most hours Rodriguez worked in a one-week period occurred during the week of March 27 through April 2, 2011, when he worked 76.24 hours. (Joint Supp. 56.1 ¶ 8.)

C.     Kralick

Unlike the Compensation Agreements of Ramos and Rodriguez, Kralick's Compensation

---

[13] All references to "Rodriguez Tr." refer to the Deposition of Ed Rodriguez in this action, excerpts of which both parties have submitted in connection with the cross-motions for summary judgment.

Agreement did not include any language about his position being "salaried, non-exempt," nor did his original 2002 agreement or his "Offer of Employment" letter. (*See* Ambinder Decl. Ex. G at ECF 55, 56; Warshaw Decl. Ex. S.) However, his "Offer of Employment" letter, dated August 23, 2002, stipulated that he would be "paid on a fluctuating work week method with a salary of $35,000 a year plus overtime." (Warshaw Decl. Ex. S at ECF 4.) His original 2002 agreement similarly stated that his "overtime compensation [would] be based on the fluctuating workweek method of compensation," meaning "[s]ince the salary [he] receive[d] covers all hours worked, the straight time portion of [his] overtime is being paid in [his] base salary." (Ambinder Decl. Ex. G at ECF 55.) His Compensation Agreement, signed in 2005, did not refer explicitly to the FWW method, but stated that he would "be paid a weekly salary of $730.77," which "represent[ed] straight time compensation for all hours worked and [would] not fluctuate whether [Kralick] work[ed] more or less than 40 hours in a week period." (*Id*. at ECF 56.)

Kralick's weekly salary ranged from $838.00 in 2008 to $959.56 by the time of his departure, such that his regular rate went from $20.95 to $23.99, and his overtime rate went from $10.47 to $12.00. (Pl. 56.1 ¶¶ 57, 60, 61; Def. Resp. to Pl. 56.1 ¶¶ 57, 60, 61.) Plaintiffs assert that Kralick received his hourly rate—ranging between $20.95 to $23.99—only for the first 40 hours worked in any given week, and then was paid only half that rate—ranging between $10.47 to $12.00—for each hour worked above 40. (Pl. 56.1 ¶¶ 57, 61.) Defendant contends, to the contrary, that Kralick was paid a fixed weekly salary for all hours worked in a week, ranging from $838.00 to $959.56 throughout his tenure, and that his regular rate—dividing his applicable weekly salary by 40—was calculated solely for the purposes of determining and showing Kralick's 50% overtime premium. (Def. Resp. to Pl. 56.1 ¶¶ 57, 61.)

Kralick testified that his hours "w[ere] all over the place" and that he "never worked the

same hours [day to day], week to week, [or] month to month" in light of the differing nature of each week's assignments. (Kralick Tr.[14] at 93:14–94:3.) According to Plaintiffs, the average number of hours Kralick worked per week was 53.6. (Ambinder Decl. ¶ 56.) The greatest number of hours Kralick worked during his tenure with Telgian was during the week of February 6 through 12, 2011, when he worked 66.1 hours. (Joint Supp. 56.1 ¶ 15.)

D.    Emerson

Emerson's Compensation Agreement stated that his position was "salaried, non-exempt," which meant that he was "paid both for the job function and for hours that [he] work[ed] in excess of 40 per week . . . ." (Ambinder Decl. G at ECF 58; *see also* Warshaw Decl. Ex. L at ECF 12 (Emerson "Offer of Employment" letter, dated March 12, 2007, stated: "This is a salaried, non-exempt position, which means you are paid both for the job function and for overtime hours at a half-time rate.").) His Compensation Agreement provided for a "$1,791.67 semi-monthly" salary, which, "if annualized is the equivalent of $43,000.00." (Ambinder Decl. Ex. G at ECF 58; *see also* Def. 56.1 ¶ 35 (Emerson's starting salary was $1,791.67 "semi-monthly," but by the time he ended his employment, he was paid $1,920.00 bi-weekly).) The Compensation Agreement provided that Emerson's "semi-monthly salary represent[ed] straight time compensation for all hours worked and [would] not fluctuate whether [he] work[ed] more or less than 40 hours in a week period." (Ambinder Decl. Ex. G at ECF 58.)

Emerson's Compensation Agreement explained that his "hourly rate for overtime purposes [would be] calculated by dividing $43,000.00 by 2080 hours (40 hours x 52 workweeks in a year)," meaning that his "overtime compensation rate [would] be based off an hourly rate of $20.68

---

[14] All references to "Kralick Tr." refer to the Deposition of Edward Kralick in this action, excerpts of which both parties have submitted in connection with the cross-motions for summary judgment.

($43,000/2080)." (Ambinder Decl. Ex. G at ECF 58.) For the period relevant to the claims at issue, Emerson was paid a fixed weekly salary ranging from $826.93 to $961.54,[15] such that his regular hourly rate ranged from $20.67 to $24.04 per hour, and his overtime rate ranged from $10.34 to $12.02 per hour. (*See* Pl. 56.1 ¶¶ 69, 72, 79; Def. Resp. to 56.1 ¶¶ 69, 72.) Plaintiffs contend that Emerson's hourly rates were his rates of pay only for the first 40 hours in a week, and that he was paid only half those rates—between $10.34 and $12.02—for hours worked over 40 in any given week. (Pl. 56.1 ¶¶ 69, 73.) Defendant disputes this and contends that Emerson's fixed weekly salary—ranging from $826.93 to $961.54 during the relevant period at issue—was compensation for all hours worked, and that his regular rate of pay between $20.67 and $24.04 per hour was calculated solely for the purposes of determining and showing his 50% overtime premium, which ranged from $10.34 to $12.02 per hour for hours worked over 40 in a week. (Def. Resp. to Pl. 56.1 ¶¶ 69, 73.)

Emerson testified that his hours varied from 50 to 55 hours per week depending on his workload and travel, though his hours varied below 50 hours and above 55 hours in certain weeks. (Emerson Tr.[16] at 60:4–18; Ambinder Decl. ¶ 57 (Emerson's "Average hours worked per week" was "47").) He worked a high of 69.24 hours in a single week, during the week of January 12 through 18, 2014. (Joint Supp. 56.1 ¶ 22.)

III.   Plaintiffs' Other Sources of Information Regarding Their Compensation

In addition to the Compensation Agreement, Ramos received a "Notice for Employees Paid

---

[15] Plaintiffs allege that when Emerson departed Defendant, his salary was $961.54 per week. (Pl. 56.1 ¶ 72.) Defendant does not dispute this, though it asserts that Emerson's final salary was approximately $960.00 per week. (*See* Def. Resp. to Pl. 56.1 at 21 n.4.)

[16] All references to "Emerson Tr." refer to the Deposition of Dan Emerson in this action, excerpts of which both parties have submitted in connection with the cross-motions for summary judgment.

a Weekly Rate or a Salary for a Fixed Number of Hours (40 or Fewer in a Week)" ("Fixed Rate/Salary Notice"), dated January 31, 2014. (Ambinder Decl. Ex. L at ECF 51.) This notice stipulated that Ramos's "pay rate" would be "$1760 per two weeks," defining his "[w]eekly hours" as 40 and his "Overtime Pay Rate" as "$11 per hour." (*Id*.)

Emerson received two Fixed Rate/Salary Notices, one attached to an email dated January 15, 2013, and one attached to an email dated January 31, 2014. (*Id*. at ECF 52–55.) Both notices stipulated that Emerson's "pay rate" was "$1923.08 per two weeks," that his "[w]eekly hours" were "40," and that his "Overtime Pay Rate" was "$12.02 per hour." (*Id*. at ECF 52, 54.) On the January 15, 2013 notice, there was a handwritten notation reading "[f]luctuating work week" next to Emerson's "Overtime Pay Rate," but no such notation appears on the January 31, 2014 notice. (*Id*.) In an email dated February 23, 2014 to HR Coordinator Andrea Rollie, copying Flori and Mark Sylvester, Emerson stated that he "ha[d] not signed the [January 31, 2014 Fixed Rate/Salary Notice] regarding the pay rate . . . because[,] as stated on the form[,] overtime must be at least 1 ½ times the workers [sic] regular rate, with few exceptions." (*Id*. at ECF 55–56; *see also id*. at ECF 54 (Rollie's title was "HR Coordinator"); Def. 56.1 ¶ 26 (Flori is Telgian's Human Resources Supervisor); Ambinder Decl. Ex. F ¶ 4 (Sylvester was one of Emerson's regional field supervisors).) Flori responded in an email dated February 26, 2014, stating that New York State law "requires [Defendant] to pay in the manner and methods provided in the Federal Fair Labor Standards Act (FLSA)," which "allows [Defendant] to pay ½ time overtime to salaried, non-exempt associates under the Fluctuating Workweek rule, meaning that you receive your full salary even on weeks that you do not work a full 40 hours due to completing your schedule early, but still receive ½ time OT for hours worked over 40." (Ambinder Decl. Ex. L at ECF 56.) Emerson testified that this description was "[n]ot inaccurate, but hypothetical" because it "never occurred."

(Def. 56.1 ¶ 26; Emerson Tr. at 138:10–23.)[17]

Plaintiffs occasionally discussed their compensation with other fire protection inspectors. For example, Ramos often discussed Defendant's FWW payment method and his belief that this method was "unfair." (Def. 56.1 ¶ 14; Ramos Tr. at 33:15–34:22.) Emerson also discussed, on a frequent basis, Defendant's FWW compensation method with other fire protection inspectors, with the hope they could convince Defendant to change its compensation scheme, which never happened. (Def. 56.1 ¶ 27; Emerson Tr. at 15:19–16:15, 87:17–88:2.) And at least twice per year, Rodriguez spoke with other fire protection inspectors regarding his compensation and how it was unfair. (Def. 56.1 ¶ 18; Rodriguez Tr. at 74:15–80:25.)

Ramos testified that he did not understand his method of compensation until he received his first paystub. (Ramos Tr. at 71:22–25.) He did not understand that, if he worked less than 40 hours in a week, he would still be paid for 40 hours of work; his belief was that he "was only going to get paid for the amount of hours that [he] worked." (*Id.* at 75:19–76:9.)

By contrast, Rodriguez testified that he understood that his position was "salaried nonexempt," meaning that he was "paid both for the job function and for overtime hours at a halftime rate." (Rodriguez Tr. at 68:3–16.) While it was "always on [Rodriguez's] mind that [this payment method] just didn't feel right," he "just didn't say anything" and when he signed his Compensation Agreement, he "agreed to work with this pay method." (*Id.* at 71:2–24.) At the time Rodriguez was hired, however, he discussed how he would be paid with Jeff Playter, who

---

[17] Plaintiffs, however, provide evidence indicating that there were at least eight occasions when Emerson worked under 40 hours in a week, without time off due to vacation or a company-recognized holiday. (Ambinder Decl. ¶ 57.)

was Rodriguez's supervisor during part of his tenure at Telgian (Rodriguez Decl.[18] ¶ 4). Playter told Rodriguez: "[Y]ou're going to get $20 an hour, and . . . this is where it gets kind of weird, you're going to get [] halftime after 40." (Rodriguez Tr. at 60:9–14.)

Kralick testified that he was told that he "should be getting paid for 40 hours every week regardless if [he] worked less than 40 hours." (Kralick Tr. at 59:8–13.) But "even [with] the formula [] in front of [his] face and [] telling [him] how it was done, [Kralick] never understood it from the very beginning"; Kralick "didn't really understand how [Defendant] calculated the formula when [he] worked 50 hours, 60 hours, 70 hours overtime." (*Id.* at 61:13–62:10.)

Emerson testified that he was told he would be paid for 40 hours of work "even if [Telgian] didn't have that much work for [him]." (Emerson Tr. at 14:19–25.) Emerson testified, however, that he "wasn't always completely and totally clear" on how his overtime rate was calculated and whether it was based on a certain hourly rate, though he had a "general understanding" that it was "based on half of [his] regular hourly rate." (*Id.* at 97:19–98:9.) Emerson did not know whether he would have gotten his "standard 40-hour salary" if he had worked less than 40 hours in a given week, but knew that "if [he] took a day off, [he]'d have to use personal time off." (*Id.* at 138:3–9.)

*LEGAL STANDARD*

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient

---

[18] All references to "Rodriguez Decl." refer to the Declaration of Ed Rodriguez in support of Plaintiffs' motion for summary judgment, attached as Exhibit D to the Ambinder Declaration.

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party will be insufficient; rather, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation marks omitted) (alterations in original); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation") (quotation marks omitted); *see also Miner v. Clinton Cty.*, 541 F.3d 464, 471 (2d Cir. 2008) (nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful") (quotation marks omitted). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation marks omitted) (emphasis in original).

Where the parties have cross-moved for summary judgment, as here, the Court construes the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all reasonable inferences against the respective movant. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009). However, "the mere existence of *some* alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."
*Anderson*, 477 U.S. at 247–48 (emphasis in original).

*DISCUSSION*

I.      FLSA & NYLL Unpaid Overtime Claims

Plaintiffs allege that Defendant violated both the FLSA and the NYLL by failing to compensate Plaintiffs properly for overtime, which Defendant disputes.

A.      Fluctuating Work Week Compensation Scheme

In relevant part, the FLSA provides that employers shall pay their employees at the rate of one and one-half their regular rate of pay ("time-and-a-half") for any hours worked over 40 in a workweek. *See* 29 U.S.C. § 207(a)(1); *Perez v. Platinum Plaza 400 Leaners, Inc.*, No. 12 Civ. 9353, 2015 U.S. Dist. LEXIS 54066, at *5 (S.D.N.Y. Apr. 24, 2015).[19] In the case of salaried, rather than hourly, employees, both the FLSA and the NYLL "presum[e] that [] a weekly salary covers only the first forty hours, unless the parties intend and understand the weekly salary to include overtime hours at the premium rate." *Perez*, 2015 U.S. Dist. LEXIS 54066, at *6 (quotation marks and citation omitted).

"[W]here an employee has a 'mutual understanding with his employer that he will receive a fixed amount as straight-time pay for whatever hours he is called upon to work in a workweek, whether few or many,'" "[t]he fluctuating workweek method is the approved method for arriving at the regular hourly rate for overtime purposes." *Luo v. L&S Acupuncture, P.C.*, No. 14 Civ. 1003, 2015 U.S. Dist. LEXIS 33102, at *19 (E.D.N.Y. Jan. 23, 2015) (alterations and citation

---

[19] The NYLL is "the state analogue to the federal FLSA" and "echoes the FLSA in compensation provisions regarding overtime . . . requirements." *D'Arpa v. Runway Towing Corp.*, No. 12-CV-1120, 2013 U.S. Dist. LEXIS 85697, at *65 (E.D.N.Y. June 18, 2013). Therefore, the Court's FLSA analysis applies equally to Plaintiffs' NYLL overtime claims.

omitted).  The FWW, by which "the regular hourly rate is determined by dividing the fixed weekly salary by the number of hours the employee actually works in a particular week," "stands in contrast to (and offers a smaller recovery than) the standard method for calculating overtime pay to salaried employees," namely "dividing the salary by the number of hours which the salary is intended to compensate."  *Yeboah v. Cent. Parking Sys.*, No. 06-CV-0128, 2007 U.S. Dist. LEXIS 81256, at *11–12 n.3 (E.D.N.Y. Oct. 31, 2007), *overruled on other grounds by Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523 (2013) (quotation marks omitted).[20]

The FWW compensation scheme permits employers to compensate their employees at only one-half of their regular rate for hours worked over 40 in a week, but only if:  (1) the employee's hours of work fluctuate from week to week; (2) the employee receives a fixed weekly salary which remains the same regardless of the number of hours the employee works during the week; (3) the fixed amount is sufficient to provide compensation at a regular rate not less than the legal minimum wage; (4) the employer and the employee have a clear mutual understanding that the employer will pay the employee a fixed salary regardless of the number of hours worked; and (5) the employee receives overtime compensation for hours worked over 40 at a rate of one-half the regular rate, in addition to the straight time paid through the salary.  *Ayers v. SGS Control Servs.*, No. 03 Civ. 9078, 2007 U.S. Dist. LEXIS 19634, at *30 (S.D.N.Y. Feb. 26, 2007); *see also* 29 C.F.R. §

---

[20] Both the FLSA and the NYLL recognize the FWW scheme of overtime compensation. *See* 29 C.F.R. § 778.114; *Pirri v. Manhattan Luxury Autos. Inc.*, No. 115480/08, 2010 N.Y. Misc. LEXIS 1738, at *7–9 (N.Y. Sup. Ct. Apr. 14, 2010) (citing 12 NYCRR § 142-2.2 for proposition that NYLL overtime requirements do not apply "to classifications exempted from sections 7 and 13 of the FLSA," including those "non-exempt employees who are paid a fixed weekly salary"); *Anderson v. Ikon Office Solutions, Inc.*, 833 N.Y.S.2d 1, 1 (N.Y. App. Div. 2007).  The FWW method of calculating overtime originally arose in the Supreme Court case of *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942), but Department of Labor regulations were subsequently promulgated to codify it.  *See Siegel v. Bloomberg L.P.*, No. 13-CV-1351, 2015 U.S. Dist. LEXIS 5602, at *18 (S.D.N.Y. Jan. 16, 2015) (applying FWW to employees misclassified as exempt).

778.114(a); *Spataro v. Gov't Emp'rs Ins. Co.*, No. 13-CV-5020, 2014 U.S. Dist. LEXIS 109068, at *6–7 (E.D.N.Y. Aug. 6, 2014).  In other words, the FWW overtime compensation scheme is impermissible, unless the salary paid to employees is sufficiently large to ensure that there will be no workweek in which the employee's average hourly earnings from his salary fall below the applicable minimum hourly wage rate, the employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek, and the salary is paid even if an employee works less than 40 hours in a given week.  29 C.F.R. § 778.114(c).

Defendant argues that it properly compensated Plaintiffs for all hours worked, including hours worked over 40 in a week, by complying with the FWW method of payment.  (Def. Mot. at 9–19; Def. Opp. at 3–21.)  Plaintiffs contest this, arguing that (1) the FWW scheme is inappropriate because the hours that Plaintiffs actually worked did not fluctuate within the meaning of the FWW scheme (Pl. Mot. at 16–19; Pl. Opp. at 10–14), and (2) even were FWW compensation appropriate, Defendant's implementation was unlawful, because Plaintiffs' salaries compensated them only for the first 40 hours worked such that, rather than receiving proper time-and-a-half overtime premiums, they actually received an overtime rate lower than their regular rate (Pl. Mot. at 12–16, 19–22; Pl. Opp. at 14–24).

### 1.    Element 1:  Work Hours Fluctuate From Week to Week

As to the first element, Plaintiffs allege that their hours did not fluctuate as contemplated by the FWW scheme, because they did not fluctuate both above *and below* 40 hours in a week.  (Pl. Mot. at 16–19 (relying on *Spataro*, 2014 U.S. Dist. LEXIS 109068, and *Mian v. GPM Invs., LLC*, 896 F. Supp. 2d 145 (D. Conn. 2012)).)  Rather, Plaintiffs claim that their work hours rarely, if ever, went below 40 hours per week, and were always, or almost always, at or above 40 hours per week.  (*Id.*)  Defendant counters that, even if true, this fact does not render the FWW scheme

inapplicable, because the FWW requires simply that the Plaintiffs' work hours "vary, from workweek to workweek," and does not specify that these variances must be both above and below 40 hours in a workweek. (Def. Mot. at 12 (quoting *Stein v. Guardsmark LLC*, No. 12 Civ. 4739, 2013 U.S. Dist. LEXIS 103131, at *13 (S.D.N.Y. Jul. 23, 2013)) (internal quotation marks omitted).) The Court is persuaded by the argument and case law cited by Defendant, and concludes that there is no genuine issue of material fact with respect to whether Plaintiffs' hours fluctuated as contemplated by the FWW scheme.[21] They did.

Plaintiffs' interpretation of the FWW rule, as requiring an employee's work hours to fluctuate both above and below 40 hours in a week to come within the rule, finds no support in its implementing regulation, which reads, in part:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, *whether few or many*. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, *whatever their number*, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

29 C.F.R. § 778.114(a) (emphases added).

Though the reference to "few or many" reasonably may be interpreted as referring to work hours both below and above a standard workweek, *i.e.*, 40 hours, that reference clearly does not impose, or even suggest, a *requirement* that an employee's hours must vary in both directions in

---

[21] Moreover, Plaintiffs' own papers acknowledge that there were times when Plaintiffs worked less than 40 hours in a week, however infrequently and however related to personal vacation or a company-recognized holiday. (*See* Ambinder Decl. ¶¶ 54–57.)

order to come within the FWW rule.  This interpretation is confirmed by the next sentence, which discusses a fixed salary that pays for "hours worked each workweek, *whatever their number*, rather than for working 40 hours or some other fixed weekly work period."  Again, the regulation does not specify that the weekly work-hour deviations must be in both directions; the phrase "whatever the number" plainly contemplates that an employee's work hours could be either more or less than the 40-hour or other fixed workweek, or both.

Contrary to Plaintiffs' contention, this interpretation of the FWW rule still ensures that all employees to whom it applies will receive time-and-a-half overtime compensation, even if their work hours are only above, and never below, 40 hours in a week.  This is so because the FWW scheme requires that the employee's fixed salary "compensate the employee at straight time rates for *whatever* hours are worked in the workweek," and payment of the 50% overtime premium ensures that the "overtime pay requirement" of the FLSA is "satisfie[d]."  29 C.F.R. § 778.114(a) (emphasis added); *id*. § 778.114(c) (salaries paid under FWW "[t]ypically" "are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks as well as short ones"); *see also Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 436 (S.D.N.Y. 2013) (discussing application of FWW to calculating overtime payments for employees allegedly misclassified as exempt and concluding that 29 C.F.R. § 778.114(a) "is carefully drafted to ensure that the FWW method does not permit employers to manipulate pay scales so as to escape the FLSA's overtime requirements").[22]

The mere fact that the FWW scheme benefits employers and permits a lower recovery— albeit one that still falls within the time-and-a-half overtime requirements of the FLSA—than is

_____

[22] Indeed, as demonstrated by Plaintiffs' own evidence, even for the weeks that they worked the most hours, they were compensated for *all* of their work hours at the regular rate, plus half of their regular rate for their overtime hours.  *See infra* at pp. 24–25, 28–31.

available to employees not subject to the FWW rule does not justify reading into the regulation a requirement that otherwise does not exist. Indeed, this potential flaw in the FWW compensation structure has long been recognized, but has not rendered the scheme any less permissible or enforceable. *See, e.g., Missel*, 316 U.S. at 580 ("[I]f there is a fixed weekly wage regardless of the length of the workweek, the longer the hours the less are the earnings per hour [and therefore the corresponding overtime rate]."); *see also* Updating Regulations Issued Under the Fair Labor Standards Act ("FLSA Updating Regs."), 76 Fed. Reg. 18832-01, 18850 (Apr. 5, 2011) ("[T]he Department is cognizant that [the FWW] method of pay results in a regular rate [and therefore an overtime rate] that diminishes as the workweek increases, which may create an incentive to require employees to work long hours.").

### 2. Element 2: Same Fixed Weekly Salary Regardless of Hours Worked

There is, however, a genuine issue of material fact as to whether Plaintiffs were paid the same fixed weekly salary each week regardless of the hours worked. Plaintiffs point to evidence in the record that seemingly belies Defendant's assertion that the Plaintiffs "received a fixed weekly salary regardless of whether they worked less than or more than 40 hours in a week." (*Compare* Def. 56.1 ¶ 7, *with* Pl. Resp. to Def. 56.1 ¶ 7.) For example, Defendant asserts that Ramos's fixed salary was $1,760 on a bi-weekly basis. (Def. 56.1 ¶ 32.) However, Plaintiffs point to three separate pay periods when Plaintiff Ramos appears to have received less than $1,760. (*See* Ambinder Opp. Decl. Ex. A at ECF 9 (regular earnings of $1,679.70), 11 (regular earnings of $1,477.30), 21 (regular earnings of $353.54).) Defendant addresses only one of these instances— the last one—arguing that Ramos's compensation of $353.54 was a proportionate amount of his salary for days worked during his last week of employment, when he resigned mid-week. (Def. Opp. at 19.) But there is no evidence in the record that would permit the Court to determine in

each instance, and for each Plaintiff, whether, during those weeks where Plaintiffs appear to have been compensated at less than their fixed salary, that salary was being pro-rated as a result of company holidays, Plaintiffs' own personal or medical leave, Plaintiffs' departure from Telgian, or for any other reason consistent with the FWW scheme. For this reason, Defendant's motion for summary judgment on Plaintiffs' FLSA and NYLL claims must be denied.

### 3. Element 3: Fixed Weekly Salary Compensates All Hours Worked At Least At Minimum Wage

For the FWW scheme to apply, Plaintiffs' salaries must compensate them at least at the minimum wage for all hours actually worked. *See* 29 C.F.R. § 778.114(c) (FWW may not be used "unless the salary is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate applicable"); *see also Ayers*, 2007 U.S. Dist. LEXIS 19634, at *36–37 (the FWW scheme "may not be used unless the salary is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate applicable under [FLSA]") (quotation marks and citation omitted).[23] Here, there is no

---

[23] The minimum wage applicable in a given time period depends on whether the FLSA or the relevant State labor law provides for a higher minimum wage, with the greater wage controlling. *See* 29 U.S.C. § 218(a) (FLSA does not excuse "noncompliance with any . . . State law . . . establishing a minimum wage higher than the minimum wage established under [FLSA]"); NYLL § 652(1) (setting forth minimum wage over various time periods "or, if greater, such other wage as may be established by federal law pursuant to 29 U.S.C. section 206 [§ 6 of FLSA]"); *see also Humphrey v. RAV Investigative & Sec. Servs. Ltd.*, No. 12 Civ. 3581, 2016 U.S. Dist. LEXIS 31780, at *19 n.10 (S.D.N.Y. Mar. 10, 2016) (finding FLSA minimum wage "controlling for that period" during which FLSA "established a greater minimum wage than New York did").

The relevant limitations periods for Plaintiffs' claims are six years for Plaintiffs' NYLL claims, NYLL § 198(3), and two or three years for Plaintiffs' FLSA claims, the longer one applying if Defendant's violations of the FLSA were willful, 29 U.S.C. § 255(a). Any cognizable claims raised by Plaintiffs, therefore, arose at the earliest on May 30, 2008, six years prior to the filing of Plaintiffs' complaint on May 30, 2014. (Dkt. 1.) For purposes of compliance with the third element of the FWW scheme, therefore, the relevant minimum wage is the NYLL's $7.15 per hour from the onset of Plaintiffs' claims through July 23, 2009, the FLSA's $7.25 per hour

dispute that the salaries of each of the Plaintiffs compensated them at least at minimum wage for all hours worked, even on the weeks during which Plaintiffs worked the longest hours. (*See generally* Joint Supp. 56.1.)[24] Plaintiffs appear to conflate this element of the FWW scheme— that the fixed salary *did*, in fact, compensate Plaintiffs at least at the minimum wage rate for all hours actually worked—with the fourth element—whether there was a clear mutual understanding that the fixed salary was *meant* to compensate employees for all hours actually worked, rather than just for the first 40 or for some other fixed amount in a given week.

4. <u>Element 4: Clear Mutual Understanding that Plaintiffs' Salary Would Compensate Them For All Hours Worked</u>

There is, however, a genuine issue of material fact as to whether there existed a clear mutual understanding that Plaintiffs' salaries would compensate them for all hours worked, whether above or below 40. This is not because, as Plaintiffs argue, Defendant's payment method, as described in Plaintiffs' contracts and as applied in practice, did not satisfy certain of the FWW's requirements,[25] though language in the Compensation Agreements provides some evidence on this

---

from July 24, 2009 through December 30, 2013, and the NYLL's $8.00 per hour from December 31, 2013 through July 4, 2014, when the last of the Plaintiffs (Emerson) left Defendant's employ (Def. 56.1 ¶ 5). *Compare* 29 U.S.C. § 206(a)(1)(A–C), *with* NYLL § 652(1).

[24] Plaintiffs dispute this as to Ramos, but cite evidence only for the proposition that "Ramos's overtime rate of pay when in New York in 2014 was lower than the one-and-a-half times New York's minimum wage rate." (Pl. Resp. to Def. 56.1 ¶ 32.) This does not dispute the actual fact that his salary compensated Ramos in straight time at least at the minimum wage for all hours worked. Moreover, a calculation of Ramos's actual hourly rate for all hours worked, even accounting for the occasions on which Ramos appears to have been compensated at less than his fixed salary (*see id.* ¶ 7) indicates that he was compensated at above minimum wage for all hours worked (*see* Ambinder Opp. Decl. Ex. A).

[25] Precisely this argument has been rejected by courts in this Circuit. *See, e.g., Ayers*, 2007 U.S. Dist. LEXIS 19634, at *39–40 (rejecting plaintiffs' argument that, "because [defendant's] payment method – as described in the Employee Handbook and as applied in practice – did not satisfy the 'fixed salary' requirement" of the FWW, "Plaintiffs could not have had 'a clear mutual understanding'" that they were being paid according to the FWW method).

issue. Rather, this is because a reasonable juror reviewing that contract language, coupled with Plaintiffs' testimony regarding their understanding of how they were being compensated, *see supra* pp. 15–16, could conclude that Plaintiffs did not believe or understand that their fixed salaries were intended to, or did, in fact, compensate them for every hour that they actually worked.

The language of the Compensation Agreements itself is cause for confusion. Each of the agreements contained a clause indicating that Plaintiff's bi-weekly salary represented "*straight time* compensation for *all hours worked*," and that this salary would not fluctuate regardless of whether Plaintiff worked more or less than 40 hours in a week. (*See* Ambinder Decl. Ex. G at ECF 51, 53, 56, 58 (emphases added).) At the same time, though, the agreements explain that Plaintiffs would be paid at the employee's fixed regular hourly rate (*i.e.*, fixed weekly salary divided by 40) for the first 40 hours that they worked, and then only half that rate for any hours worked over 40[26]—a formula plainly contradictory to the representation that the employees would receive "straight time," *i.e.*, their fixed hourly rate, for "*all hours worked*," not just the first 40 hours worked, and regardless of whether the hours are "more or less than 40."[27]

---

[26] The Compensation Agreement reinforces this interpretation with a sample calculation: "if [a Plaintiff's] normal hourly rate is $10 per hour, and [he] work[s] 50 hours, [he] would be paid 40 x $10 plus 10 x $5 for a total of $450." (Pl. 56.1 ¶ 15; *see also* Ambinder Decl. Ex. G at ECF 51, 53, 56, 58.) While the formula recited by Defendant in Plaintiffs' Compensation Agreements does not comply with the FWW methodology for calculating regular and overtime wages, nor, in fact, does it appear to reflect how Defendant actually calculated Plaintiffs' wages, nevertheless, this language is a source of confusion sufficient to create a dispute of fact regarding whether there existed the requisite clear mutual understanding between employer and employee.

[27] Defendant argues that "the [] Plaintiffs' 'after-the-fact verbal contentions' disputing the clear terms of their [Compensation Agreements] cannot create a genuine issue of material fact whether [Defendant] satisfied the FWW." (Def. Reply at 6.) But it is precisely the language of the Compensation Agreements that is *not* clear and is seemingly internally inconsistent, and leads the Court to conclude that Plaintiffs have established a genuine issue of material fact as to whether this element of the FWW test is met.

Plaintiffs have also put forth evidence of similarly conflicting representations and explanations they received from their supervisors on whether their salaries were meant to compensate them for every hour that they actually worked when those hours exceeded 40 in a week, which the evidence indicates was the norm. For example, Rodriguez testified to a discussion with his supervisor, Playter, about "the method of how [Rodriguez] would be paid," during which Playter told Rodriguez: "[Y]ou're going to get $20 an hour, and . . . this is where it gets kind of weird, you're going to get [] halftime after 40." (Rodriguez Tr. at 60:9–14.) Kralick testified to being told that he "should be getting paid for 40 hours every week regardless if [he] worked less than 40 hours." (Kralick Tr. at 59:8–13.)[28]

Thus, because there is a genuine issue of material fact as to whether the parties had a clear mutual understanding whether Plaintiffs' salaries were meant to compensate them for *all* hours worked, the Court denies both parties' motions for summary judgment on the FLSA and NYLL

---

[28] Based on references to certain of Defendant's calculations and/or testimony (*see, e.g.*, Pl. Opp. at 14, 22; Pl. Mot. at 7–8, 12; Pl. Reply at 3–4), Plaintiffs appear to argue that, because Defendant calculated the hourly rate, and therefore the overtime rate, with reference to a 40-hour workweek, Defendant intended that Plaintiffs' salary only compensated them for the first 40 hours they worked in a week, which would clearly violate the FLSA, whether under the FWW scheme or otherwise. (*See, e.g.*, Pl. Mot. at 12.) On this point, Plaintiffs rely on a Ninth Circuit case, *Parks v. Locating, Inc.*, 37 F. App'x 901 (9th Cir. 2002), for the proposition that "an agreement to compensate a minimum of forty hours is not the same as an agreement to pay a fixed salary for all hours worked, nor can extra overtime payments cure a basic failure to meet the requirements of § 778.114." (Pl. Mot. at 15 (quotation marks omitted).) Not only is this authority not binding on this Court, but the compensation scheme in that case presents precisely the opposite calculation from the methodology employed by Defendant here. In *Parks*, the defendant employer "guarantee[d] a sum certain which [wa]s calculated by multiplying 40 hours times the employee's hourly rate, regardless of whether the employee actually worked 40 hours," meaning that it was "[a] guaranteed minimum number of hours of work," which the court construed as "the functional equivalent of a guaranteed salary." *See Parks v. Locating, Inc.*, No. C99-1488Z, 2000 U.S. Dist. LEXIS 22401, at *3–4 (W.D. Wash. May 31, 2000), *rev'd* 37 F. App'x 901 (9th Cir. 2002). By contrast, here, Defendant compensated its employees with a fixed salary and then, solely for purposes of calculating and showing Plaintiffs' regular and overtime rates, used a 40-hour workweek to ensure overpayment of the overtime premiums.

claims. The parties shall proceed to trial on this limited issue, as well as on the issue of whether Plaintiffs received a fixed salary each week, regardless of the number of hours worked.

### 5. Element 5: Employees Receive Overtime Premium of At Least 50% of Regular Rate For Hours Worked Over 40

The Court turns to the fifth and final requirement of the FWW test, that Plaintiffs be compensated for hours worked over 40 at a rate of at least 50% of Plaintiffs' regular rate, calculated by dividing Plaintiffs' fixed weekly salary by the number of hours they actually worked that week. *See* 29 C.F.R. § 778.114(a) (under FWW, regular rates of pay will "vary from week to week," and "the applicable hourly rate for the week" is "determined by dividing the number of hours worked in the workweek into the amount of the salary").[29] It is undisputed that Defendant's method of calculating Plaintiffs' overtime rates did not comply with the FWW scheme, in that Defendant failed to use the prescribed method for initially calculating the regular hourly rate, upon which Plaintiffs' overtime rates were then based. Plaintiffs note, and Defendant admits, that Defendant calculated each Plaintiff's hourly rate by dividing their annualized salary by 2,080 hours (or 40 hours multiplied by 52 weeks in a year). (Pl. 56.1 ¶¶ 11–13; Ambinder Decl. Ex. 6 at ECF 51, 53, 56, 58; Def. Mot. at 19 n.18.) The implementing regulations make clear that "the regular rate of [an] employee" being compensated under the FWW scheme "*will* vary from week to week" and "*is* determined" by dividing the number of hours worked in the workweek into the amount of the fixed salary for that week. *See* 29 C.F.R. § 778.114(a) (emphases added). Defendant's argument

---

[29] *See also* 29 C.F.R. § 778.114(b) (providing example of employee with a set salary of $600 per week and hours fluctuating over the course of four weeks, yielding hourly rates of $15, $16, $12, and $12.50 for each of the four weeks, respectively); *Luo*, 2015 U.S. Dist. LEXIS 33102, at *5–7, 19 (holding that calculation of overtime premium under FWW requires division of number of hours actually worked into amount of salary and using this formula to calculate three different hourly rates for various multi-month periods based on total compensation over those months divided by total hours worked during those months).

that this is only a permissible, but not mandatory, method of calculation (*see, e.g.,* Def. Mot. at 19; Def. Opp. at 5–7) ignores the clear language of the regulation.[30]  And even were the Court to conclude that the language of the regulation is ambiguous, the Department of Labor has interpreted the regulation as requiring that "the regular rate *must* be determined separately each week based on the number of hours actually worked each week," "[b]ecause the employee's hours of work fluctuate from week to week."  FLSA Updating Regs., 76 Fed. Reg. at 18849 (emphasis added); *see also Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 263 (S.D.N.Y. 2013) (recognizing that an "agency's interpretation of its own regulation" is entitled to deference "when the language of the regulation is ambiguous") (quotation marks and citation omitted).[31]

Plaintiffs argue that, because Defendant "failed to calculate Plaintiffs' regular rate correctly and failed to pay overtime at a rate of 150% Plaintiffs' regular rate," "the size of Plaintiffs['] overtime premium is irrelevant."  (Pl. Reply at 4; *see also id*. at 3 n.3 ("[T]he reason Plaintiffs did not actually receive a weekly salary and failed to receive overtime compensation is because

---

[30] Defendant's reliance on the Department of Labor Field Operations Handbook ("Handbook") § 32b04b(a) (Def. Mot. at 10–11, 19 n.18) is misplaced.  While Defendant is correct that the Handbook appears to have been revised in 2000 (Def. Reply at 9 n.6), the particular provision to which Defendant cites appears to be dated March 24, 1967, as Plaintiffs note (Pl. Opp. at 23–24).  Moreover, the Department of Labor's official website makes clear that the guidelines set forth in the Handbook "may not reflect current legislation, regulations, [and] significant court decisions," and refers readers to "[t]he Federal Register and the Code of Federal Regulations [as] the official resources for regulatory information published by the DOL."  Wage & Hour Div., U.S. Dep't of Labor, Field Operations Handbook, http://www.dol.gov/whd/foh/ (last updated Aug. 13, 2013).  As discussed, both of those "official resources for regulatory information" make clear that the calculation contemplated by the FWW scheme requires an hourly rate, and therefore an overtime rate, based on the number of hours actually worked.

[31] Both parties have cited case law from outside this Circuit analyzing the parameters of the FWW scheme.  (*See, e.g.,* Pl. Opp. at 16–17, 21; Def. Reply at 4 & nn.3–4; Pl. Mot. at 2; Def. Opp. at 8–9, 11–13.)  The Court is neither bound by this authority, nor does the Court find it persuasive, and certainly not as persuasive as the case law from courts within this Circuit upon which the Court has relied.

[Defendant] deviated from the FWW method by not recalculating Plaintiffs' regular rates of pay each week.").)  But this insistence that Defendant's technical violation of the FWW's is, in itself, sufficient to establish Defendant's liability under the FLSA vaults form over function, because it ignores the fact that the method used by Defendant to calculate overtime rates, though different than the method required by the FWW rule, actually resulted in Plaintiffs being paid *more than* the overtime rate mandated under the FWW scheme.  Indeed, it is undisputed that Defendant's calculated overtime rates resulted in an overpayment to Plaintiffs.  This is because dividing a constant—each Plaintiff's fixed weekly salary—by a larger number, *i.e.*, 40 hours plus however many hours each Plaintiff worked *over* 40 hours in a given week, will always result in a smaller hourly rate, and therefore overtime rate, than dividing that same constant by a smaller number, *i.e.*, 40 hours.  *See Missel*, 316 U.S. at 580 ("[I]f there is a fixed weekly wage regardless of the length of the workweek, the longer the hours the less are the earnings per hour [and therefore the corresponding overtime rate].").  The latter, more generous method is how Defendant calculated Plaintiffs' regular hourly rate.

Thus, the Court finds that, if the FWW scheme is found to apply to Plaintiffs, this element has, as a matter of law, been satisfied, despite Defendant's failure to use the prescribed method for calculating Plaintiffs' regular hourly rates, which affected their overtime rates.  To conclude otherwise would lead to the absurd result that employers such as Defendant would incur liability for paying their employees *more than* what the law requires.[32]  Such a result runs contrary to the

---

[32] Even if the failure to use the mechanical calculation called for by the regulation is itself a violation of the FLSA sufficient to subject an employer to liability, despite, as here, an employer's method of calculation resulting in overpayment, Plaintiffs' claims for unpaid overtime under a FWW scheme fail nonetheless.  Plaintiffs cannot demonstrate they were actually denied compensation to which they were entitled, meaning they cannot demonstrate they were "actually injured," and therefore "they do not have standing to raise their claims," either individually or on behalf of the putative class/collective they seek to represent, at least as to any theory of recovery

policy Plaintiffs themselves cite as "an inseparable component of the FLSA's overtime requirement," namely, "discourag[ing]" employers from "requiring its workers to work longer hours" by "increasing the cost of labor for hours worked over 40 in a week." (Pl. Reply at 6.) Here, Defendant has increased its cost of labor by compensating its employees for their overtime hours at a higher rate than legally required under the FWW scheme, which is in keeping with the spirit of "workers [being] assured additional pay to compensate them for the burden of a workweek beyond" the 40-hour standard workweek set forth in the FLSA. *See Missel*, 316 U.S. at 577–78.

B.    Willfulness

As part of their summary judgment motion, Plaintiffs request that the Court find, as a matter of law, that Defendant's violation of the FLSA, if any, was willful, and thus that the longer three-year statute of limitations applies to their FLSA claims. (*See* Pl. Mot. at 22–25; Pl. Reply at 9–10.) The Court declines to do so, and concludes, as a matter of law, that any violation of the FLSA that occurred by virtue of Defendant's compensation scheme was not willful.

While the Court agrees that the burdensomeness of calculating Plaintiffs' regular rates of pay on a weekly basis, as required under the FWW scheme, does not excuse compliance with the law (Pl. Mot. at 24), the Court cannot find that Defendants acted with "reckless disregard," so as to support a finding of willfulness, given Defendant's implementation of a system it knew would compensate Plaintiffs at a higher overtime rate than required under the FWW scheme. (*Id*. at 22.) *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Young v. Cooper Cameron*

under the FWW scheme. *See Nakahata v. N.Y.-Presbyterian Healthcare Sys.*, Nos. 11 Civ. 6658, 11 Civ. 6657, 11 Civ. 6366, 2012 U.S. Dist. LEXIS 127824, at *22 (S.D.N.Y. Sept. 6, 2012). *Cf. Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361, 2009 U.S. Dist. LEXIS 42739, at *3–4 (S.D.N.Y. May 4, 2009) (plaintiff had standing to bring class and collective claims under the FLSA because he had "individual standing" in that he alleged "he was personally injured" by defendant's "unlawfully depriv[ing] him of overtime compensation, and a favorable decision by th[e] Court would redress that alleged injury").

*Corp.*, 586 F.3d 201, 207 (2d Cir. 2009). The Court rejects Plaintiffs' contention that "[i]t takes an astounding amount of willful ignorance to overlook the obvious consequence of [Defendant's] compensation practices, *i.e.*, that Plaintiffs earned less per overtime hour than regular hour" (Pl. Reply at 9). Rather, the Court finds that it was reasonable for Defendant to conclude that the FWW scheme applied to Plaintiffs' employment and compensation, and that, by implementing a system that ensured that Plaintiffs would always be overpaid above the 50% overtime premium required by the FWW scheme, they were complying with the FLSA.

Indeed, even an employer that acts "unreasonably, but not recklessly, in determining its legal obligation" cannot be found liable for a willful violation. *McLaughlin*, 486 U.S. at 135 n.13. Here, as Plaintiffs note, Defendant apparently switched their methodology of calculating overtime compensation during the period at issue in this case: Kralick's original 2002 agreement calculated his regular rate on a weekly basis, but his subsequent and the other Plaintiffs' Compensation Agreements calculated the regular rate based on a 40-hour workweek. (*See* Pl. Mot. at 24–25.) Contrary to Plaintiffs' contention, however, the fact that Defendant switched from the methodology now championed by Plaintiffs to one designed to ensure *overpayment* of overtime compensation under the FWW scheme is more reasonably construed as demonstrating a good faith belief in the lawfulness of the latter system, rather than a willful disregard of the necessity of the former. The Court is unwilling to penalize Defendant by extending the statute of limitations by one year for having moved from a methodology that provided *less* overtime compensation to one which necessarily provides *more*.

## II.     NYLL Spread-of-Hours Claim

Plaintiffs also allege that Defendant violated various provisions of New York State law by failing to provide them "spread-of-hours" compensation. Spread-of-hours compensation is a

scheme under which employees are entitled to an extra hour's worth of pay at the minimum wage if the employee works in excess of ten hours in a day.  12 N.Y.C.R.R. § 142-2.4.  Defendant argues that Plaintiffs are not entitled to spread-of-hours compensation because they earn more than the minimum wage per hour.  (Def. Mot. at 20–22.)  Plaintiffs contest this, arguing that courts are split on whether spread-of-hours compensation is available to employees earning more than the minimum wage, and urging the Court to reject the rule articulated by Defendant.  (Pl. Opp. at 24–25.)

The Second Circuit has not yet addressed this issue definitively, but the majority rule in the Eastern and Southern Districts appears to be that employees who earn more than the minimum wage are not entitled to spread-of-hours compensation.  *See, e.g., Mendez v. U.S. Nonwovens Corp.*, No. 12-CV-5583, 2016 U.S. Dist. LEXIS 5438, at *64–65 (E.D.N.Y. Jan. 15, 2016) (while "the question of whether non-minimum wage workers are entitled to a spread of hours premium is an open question in this Circuit," "[m]ost district courts have held that the provision only applies to employees earning a minimum wage"); *Baltierra v. Advantage Pest Control Co.*, 14 Civ. 5917, 2015 U.S. Dist. LEXIS 124961, at *17 (S.D.N.Y. Sept. 18, 2015) ("A minority of decisions have applied New York's spread of hours provision to all employees, even those earning more than minimum wage," but the court held "with the majority view because the language of New York's spread-of-hours provision specifically states that the premium is 'in addition to the minimum wage,'" such that it is "expected that the provision will not affect workers whose total weekly compensation is already sufficiently above the minimum rate.") (quotation marks omitted); *Singh v. Patel*, No. 12-CV-3204, 2013 U.S. Dist. LEXIS 72619, at *5 (E.D.N.Y. May 16, 2013) (following the "majority view" that "those earning more than the minimum wage are not entitled to spread-of-hours pay") (quotation marks omitted).

This rule is motivated in large part by deference to a New York Department of Labor Opinion Letter ("DOL Opinion Letter") clarifying that, under 12 NYCRR § 142-2.4 ("Section 142-2.4"), if an employee's "regular wages" for hours worked above ten in a day is "equal to or greater than th[e] 'spread of hours pay,' no additional wages need be paid." *See* N.Y.S. Dep't of Labor 3/16/07 Opinion Letter at 1, File No. RO-07-0009, http://labor.ny.gov/legal/ counsel/pdf/Minimum%20Wage%20Orders/RO-07-0009A.pdf (last visited Mar. 30, 2016). Both federal and state courts, deferring to this interpretation, have applied the DOL Opinion Letter as obviating an employer's duty to pay an additional hour at the minimum wage rate to employees earning more than that rate when they work more than ten hours in a day. *See, e.g., Humphrey*, 2016 U.S. Dist. LEXIS 31780, at *18 ("The DOL has interpreted New York's spread of hours provision as applying only to employees earning minimum wage, . . . and the majority of district courts in this circuit are in accord with the DOL's position that those earning more than the minimum wage are not entitled to spread-of-hours pay . . . .") (quotation marks and citations omitted) (alterations omitted); *Guadalupe v. Tri-State Empl.*, No. 10-CV-3840, 2013 U.S. Dist. LEXIS 123951, at *36–38 (E.D.N.Y. July 31, 2013), *adopted in full*, 2013 U.S. Dist. LEXIS 122776 (E.D.N.Y. Aug. 27, 2013) (deferring to DOL's interpretation and denying plaintiffs' request for spread-of-hours compensation "[s]ince there is no question that plaintiffs' hourly rates . . . [were] well in excess of the applicable minimum wage"). *See also Seenaraine v. Securitas Sec. Servs. USA, Inc.*, 830 N.Y.S.2d 728, 729 (N.Y. App. Div. 2007) (deferring to DOL's interpretation of regulation and denying plaintiff's claim for spread-of-hours compensation thereunder because interpretation was not "in conflict with the plain meaning of the promulgated language" and was "neither unreasonable nor irrational").

As Plaintiffs note, there are a handful of cases that disagree with this approach. (Pl. Opp.

at 24–25 (citing, among others, *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 339–40 (S.D.N.Y. 2005).) But those courts appear to be in the minority. *Cf. Ellis v. Common Wealth Worldwide Chaueffuered [sic] Trans. of N.Y.*, No. 10-CV-1741, 2012 U.S. Dist. LEXIS 40288, at *21–23 (E.D.N.Y. Mar. 23, 2012) (noting that "a majority of the cases since [*Doo Nam*] *Yang* have disagreed as to both the holding that the plain language of the statute did not limit its applicability to minimum wage workers and the court's decision not to grant deference to the [DOL] opinion letter" and holding that "the spread of hours statute applies only to employees making minimum wage") (quotation marks and citation omitted).

Moreover, the Court finds that the interpretation of Section 142-2.4 adopted in the cases cited by Plaintiffs is contrary to a plain text reading of the regulation. Section 142-2.4 makes clear that the extra hour's pay of minimum wage for more than ten hours of work in one day is "in addition to the minimum wage required" by the NYLL. 12 NYCRR § 142-2.4. In other words, the language of the regulation provides for supplemental spread-of-hours compensation for workers who earn only minimum wage under the NYLL, rather than for those who earn more, and in Plaintiffs' case, generally substantially more, than the minimum wage.

Finding the reasoning of the majority view persuasive, particularly in light of a plain text reading of the regulation, the Court elects to follow the majority view, and finds that Section 142-2.4 does not apply to workers who earn more than minimum wage for all hours that they work. Therefore, the Court grants Defendant's motion for summary judgment, and denies Plaintiffs' cross-motion for summary judgment, on Plaintiffs' spread-of-hours claim, which is dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Plaintiffs' cross-motion for summary judgment is DENIED.

Based on the Court's rulings, there remain two issues of fact to be determined regarding the applicability of the FWW scheme: first, whether Defendant paid Plaintiffs their fixed salaries regardless of the number of hours worked, and second, whether there existed a clear mutual understanding that Plaintiffs' fixed salaries were intended to compensate them for every hour actually worked, rather than for some fixed number of hours. The Court believes, in light of its rulings, that the issue of class and/or collective certification should be determined prior to any trial. Therefore, the parties shall submit, within 30 days of the entry of this Order, a joint proposed discovery and briefing schedule for certification. Should either party object to proceeding in this manner, that party shall file a letter within 14 days of the entry of this Order, setting forth the bases of its objection.

SO ORDERED:

 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: March 31, 2016
        Brooklyn, New York